# In the United States Court of Federal Claims

No. 22-871C
Filed: October 5, 2023

|  |  |
|---|---|
| PAMELA BENNETT and JAMES BENNETT, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| *Defendant*. | ) ) ) |

*Pamela Bennett* and *James Bennett*, pro se.

*Yariv S. Pierce*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Steven J. Gillingham*, Assistant Director, for Defendant. *Jeffrey Kinstler*, Office of the Comptroller of the Currency, *of counsel*.

## OPINION AND ORDER

**MEYERS, Judge**.

Bank of America foreclosed a property owned by Pamela Bennett. Ever since, Pamela and James Bennett have been litigating in courts across the country challenging the foreclosure without success. Now they sue here, alleging that the United States owes them compensation because the Office of the Comptroller of the Currency ordered Bank of America to pay restitution to certain people whose property it foreclosed. Because the Bennetts fail to allege any nonfrivolous claim that falls within this Court's jurisdiction, the Court grants the Government's motion to dismiss this case for lack of subject matter jurisdiction.

### I.  Background

#### A.  Plaintiffs' foreclosure.

James Bennett transferred title in the property located at 8129 Via Luna, Rancho Santa Fe, CA 92067 (the "Property") to his wife, Pamela Bennett, on February 26, 2007. *See* ECF No. 1-2 at 72, 89-91, 94, 132.[1]  Pamela then obtained a $2,000,000 loan secured by a deed of trust

---

[1] Given the transfer of the property from James to Pamela and the loan being only in her name, it is not clear what interest James had in the Property at the time of the foreclosure that entitles him

against the Property, which identified America's Wholesale Lender as Lender, Pamela Bennett as the sole Borrower, Recontrust Company, N.A. ("Recontrust") as Trustee, and Mortgage Electronic Registration Systems, Inc. as Nominee. *Id.* at 89. On December 11, 2009, Recontrust initiated foreclosure proceedings against Pamela Bennett with respect to the Property by recording a Notice of Default and Election to Sell in the Office of the Recorder of San Diego County. *Id.* at 176-78. On July 23, 2012, Recontrust sold the Property at public auction to Bank of America, N.A. ("BANA"), with BANA "being highest bidder at said sale . . . for the amount bid, which amount was $1,775,000." *Id.* at 74-75. "All beneficial interest under that certain Deed of Trust dated 02/26/2007, executed by: Pamela Bennett, a married woman as her sole and separate property, Trustor[,] to Recontrust Trust Company, N.A., Trustee" then transferred to BANA, "together with the Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust." *Id.* at 72. At the time of foreclosure, the amount of unpaid debt remaining on the Property was $2,900,847.62. *Id.* at 74. "All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, and the recording, mailing, posting, and publication of the Notice of Trustee's Sale [were] complied with." *Id.*

### B.     The Consent Order.

In 2011, the United States Office of the Comptroller of the Currency ("OCC" or "Comptroller") "conducted an examination of BANA's residential real estate mortgage foreclosure processes. ECF No. 1-2 at 2. The examination "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings[,]" including, among other violations, the filing of affidavits that "represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review . . . ." *Id.* at 2-3. Additionally, OCC found that BANA failed to: (1) file properly notarized affidavits and mortgage-related documentation in state and federal courts; (2) ensure proper endorsement and assignment of promissory notes and mortgage documents prior to initiating foreclosure proceedings; (3) devote sufficient resources and oversight to foreclosure processes and administration; and (4) adequately oversee outside counsel and third-party providers in the management of foreclosure-related services. *Id.* at 3-4. Accordingly, OCC issued a cease-and-desist order to BANA on April 13, 2011 (the "Consent Order") pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1818(b)(1). The Consent Order required BANA to pay restitution to those harmed by its practices. ECF No. 1-2 at 18; *see also* 12 U.S.C. § 1818(b)(6)(A) (authorizing OCC to order financial institutions to pay restitution for violations resulting in unjust enrichment or from reckless disregard for the law).

BANA executed a Stipulation and Consent following receipt of the Consent Order, thereby entering a settlement with OCC. ECF No. 1-2 at 29-35; *see id.* at 27 ("This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the

---

to bring an action regarding the foreclosure. Because the parties do not address this issue, the Court assumes for the purpose of this opinion that James had a sufficient interest in the Property to bring this action as a plaintiff.

Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings . . . ."). BANA agreed to "maintain[] effective mortgage servicing, foreclosure, and loss mitigation activities[,] . . . as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions." *Id.* at 6.  BANA also consented to an independent review of its residential foreclosure actions by a third-party consultant, which assessed "residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, . . . pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period." *Id.* at 15.  The Consent Order required BANA to "reimburs[e] or otherwise appropriately remediat[e] borrowers" for financial injury caused by errors, misrepresentations, or other deficiencies identified in the independent review, and to take "appropriate steps to remediate any foreclosure sale where the foreclosure was not [properly] authorized . . . ." *Id.* at 18.  The Consent Order, however, "expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States" and "[n]othing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties [t]hereto, and their successors [t]hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order." *Id.* at 27-28; *see also id.* at 49.

On February 27, 2012, OCC and BANA entered into a formal Civil Settlement Agreement "to settle certain potential state and federal claims relating to the Bank's residential mortgage origination, servicing, and foreclosure practices" identified in the Consent Order. *Id.* at 100.  As part of the settlement, BANA "agreed to provide consumer relief," which included "mortgage principal reductions or refinancing, and other assistance to certain residential mortgage borrowers (the 'Borrower Assistance') . . . [and] to make certain payments to the United States and the settling States (the 'Hard Dollar Payments')[,]" with an aggregate value "expected to be equal to or exceed $10.8 billion[.]" *Id.* at 100.  In turn, OCC waived its right to assess "civil money penalties in connection with the Consent Order" despite its belief "that grounds exist[ed] to assess civil money penalties against the Bank in the amount of $164,000,000 . . . ." *Id.* at 101.  If BANA failed "to make Borrower Assistance and Hard Dollar Payments with an aggregate valuation of at least $164,000,000 within three (3) years of the date of execution of the Civil Settlement Agreement[,]" OCC reserved its right to order BANA to pay (1) "the difference between the aggregate valuation of Borrower Assistance and Hard Dollar Payments actually made by the Bank, and $164,000,000, plus interest" or (2) "other specified actions . . . that provide assistance to troubled borrowers and/or reduce avoidable foreclosures . . . having a monetary value of such difference." *Id.* at 102-03.

On February 28, 2013, OCC and BANA amended the Consent Order (the "Amendment") in an effort to provide "the greatest benefit to borrowers potentially affected by the practices at the Bank addressed in the 2011 Consent Order in a more timely manner . . . ." *Id.* at 38.  The Amendment, in relevant part, repealed BANA's initial remediation obligations and ordered BANA to pay $1,127,453,261 to a Qualified Settlement Fund, from which OCC and the Board of Governors (together, the "Regulators") would direct, in their sole discretion, distributions to borrowers against whom BANA had pending or completed foreclosure actions between January 1, 2009 and December 31, 2010. *Id.* at 39.  "The Regulators will determine the specific payment amounts applicable to each category of borrower . . . and will direct the Paying Agent [Rust Consulting, Inc.] to distribute payments from the Fund . . . ." *Id.* at 40.  BANA also agreed to

allocate $1,759,125,217 toward loss mitigation and other foreclosure prevention actions on or before January 7, 2015, which "shall be in addition to, and shall not be used to fulfill, the Bank's consumer relief obligations under the NMS [National Mortgage Settlement]." *Id.* at 43. "In recognition of the Bank's cash payments of $1,127,453,261 to the Fund and Foreclosure Prevention commitments made pursuant to this Amendment[,]" OCC again agreed not to enforce civil monetary penalties under 12 U.S.C. § 1818(b), with respect to (1) unsafe and unsound practices identified in the 2011 Consent Order; (2) BANA's remediation obligations prior to effecting the Amendment; and (3) other improper mortgage servicing and foreclosure-related practices covered by the Consent Order and predating the Amendment, provided that such practices do not violate the terms of the Amendment.  ECF No. 1-2 at 45-46.

        **C.**      **Plaintiffs' litigation of the foreclosure.**

Since the foreclosure, Plaintiffs have established an "extensive history of [] relitigating issues of fact or law[,]" repeatedly alleging that BANA violated the Consent Order and engaged in a "fraudulent scheme to steal the [P]roperty through violation of foreclosure laws . . . ." *Bennett v. Bank of Am., N.A.*, No. 320CV00244RJCDSC, 2021 WL 4355959, at *3 (W.D.N.C. Sept. 24, 2021) [hereinafter *Bennett I*]. Specifically, Plaintiffs' claims have been the subject of numerous state court actions in California and North Carolina, as well as federal court actions in the Fourth and Ninth Circuits, and the United States Bankruptcy Courts. Plaintiffs have lost each case. *See, e.g., Bennett v. Court of Appeal*, No. S272634, 2022 Cal. LEXIS 5689, at *1 (Cal. Sep. 21, 2022) ("The application of petitioner for leave to file a petition for writ of mandate is hereby denied."); *Bennett v. Bank of Am. N.A.*, No. 21-2352, 2022 U.S. App. LEXIS 11991, at *1 (4th Cir. May 3, 2022) ("The court denies the petition for rehearing and rehearing en banc."); *Bennett v. Bank of Am., N.A.*, No. 21-2352, 2022 WL 986988, at *1 (4th Cir. Mar. 31, 2022) [hereinafter *Bennett II*] ("We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's orders.") (citing *Bennett v. Bank of Am., N.A.*, No. 3:20-cv-00244-RJC-DSC (W.D.N.C. Sept. 24, 2021 & Nov. 10, 2021) (dismissing Plaintiffs' allegations of wrongful foreclosure based on the Consent Order, wrongful eviction, and violation of a bankruptcy stay and denying their motion for reconsideration)); *Bennett v. Bank of Am., N.A.*, No. D072569, 2019 WL 1723402, at *2 (Cal. Ct. App. Apr. 18, 2019) [hereinafter *Bennett III*] (affirming dismissal of claims in the Superior Court of San Diego County, No. 37-2015-00024336-CU-FR-NC, alleging BANA falsified documentation to cause the recording of a Notice of Default and violated state foreclosure laws); *Bennett v. Bank of Am. Corp.*, No. B249521, 2015 Cal. App. Unpub. LEXIS 340, at *1 (Cal. Ct. App. Jan. 15, 2015) (affirming dismissals of claims in the Superior Court of Los Angeles County, No. BC477322, alleging fraudulent concealment and intentional misrepresentation against BANA); *see also Bennett III*, 2019 WL 1723402, at *2 (discussing dismissals of similar claims in Bankruptcy Court (Nos. 13-90140-MM & 13-90209-MM) and related denials of appeal by the United States Bankruptcy Appellate Panel (Nos. SC-13-1408 and SC-13-1551) and the Ninth Circuit (Nos. 14-60018 and 15-60018)). Indeed, courts have found Plaintiffs to be "vexatious litigants." *Id.* at *6. And at least one has prohibited them from bringing further claims "without posting a bond, being represented by counsel, or gaining approval by the presiding judge." *Bennett I*, 2021 WL 4355959, at *1.

Plaintiffs bring this action and continue to add to the "litany of legal proceedings" in state and federal courts "in which Plaintiffs unsuccessfully raised claims of unlawful conduct in

connection with foreclosure on their residence in Rancho Santa Fe, California." *Id.* at *1-2 (dismissing Complaint and finding that "the Comptroller Consent Order did not create a private right of action."). In this case, Plaintiffs again allege that BANA unlawfully foreclosed on their residence, and, more generally, that BANA "unjustly enriched themselves by taking homes through mortgage debt foreclosures that the homeowners never owed" to the Bank. ECF No. 11 at 1 ¶ 1.[2] Accordingly, because Plaintiffs claim to be "one of those families falling victim to BANA's foreclosure practices[,]" they assert that OCC's "Consent Order [] was supposed to remediate the illegal foreclosures by requiring full restitution for harms caused." *Id.* at 2 ¶ 8. Specifically, Plaintiffs argue that "[b]ecause the Comptroller issued a Consent Order detailing how BANA was to accomplish the Comptroller's objectives, the United States," acting through OCC, is liable as Principal for the acts of BANA—its appointed Special Agent. *Id.* at 5 ¶ 1; *see also id.* ¶ 3 (alleging BANA was "under the direction, control, and approval of the Comptroller"). And, because OCC "designated Rust Consultants, Inc. as the paying Agent [] to notify each party [who] would join the proceeding and receive payment under the Consent Order[,]" the Notice Plaintiffs received following BANA's Independent Foreclosure Review "designated [them] as parties" to the Agreement. *Id.* at 6 ¶ 3; *see also* ECF No. 11 at 59-60[3] (Notice to Pamela Bennett indicating eligibility for payment "regarding deficiencies in the mortgage servicing and foreclosure processes of Bank of America").

Plaintiffs further allege that "the Comptroller used the Consent Order as a means to take the restitution monies which should have gone to Party Victims under Title 12, United States Codes, Section 1818(b)(6)(A)(i) and (ii)." ECF No. 11 at 2 ¶ 9. This is because, Plaintiffs allege, the Amendment to the Consent Order replaced BANA's obligation to provide restitution to borrowers with "'Hard Dollar Payments' to the United States and a number of State Governments as settlement of claims[,]" from which the OCC "portioned off the small amounts remaining for payment to each Party Victim." *Id.* at 3 ¶¶ 14, 16. According to Plaintiffs, "[t]he Comptroller admitted those small amounts did 'not in any manner reflect the specific financial injury or harm that may have been suffered by borrowers receiving payments.' Thus, [OCC] admitt[ed] they were violating § 1818(b)(6)(A)(i)-(ii) and the initial Consent Order." *Id.* at 3-4 ¶ 17. And, because the Consent Order barred amendment of its terms, Plaintiffs argue that the Amendment is necessarily void. *Id.* at 4 ¶ 18.

Plaintiffs' Amended Complaint sets forth five counts: (1) OCC breached its fiduciary duty under the Consent Order and 12 U.S.C. § 1818(b)(6)(A)(i) by failing to provide restitution to Plaintiffs; (2) OCC engaged in a "continuing violation" of the Consent Order and 12 U.S.C. § 1818(b)(6)(A)(ii) by failing to provide such restitution; (3) OCC breached the terms of the Consent Order; (4) OCC assumed vicarious liability for BANA in executing the Consent Order; and (5) OCC illegally exacted funds from Plaintiffs. *Id.* at 22-36. Accordingly, Plaintiffs "seek, as restitution, the funds diverted to the United States under the Comptroller's February 27, 2012 and February 28, 2013 orders for the Comptroller's failure to remediate foreclosure harms

---

[2] The Plaintiffs restart the numbering of the paragraphs in their amended complaint multiple times. To avoid confusion, the Court cites to the pagination at the bottom of the page and paragraph number in the amended complaint.

[3] For the exhibits to the amended complaint, which are also included in ECF 11, the Court cites to the consecutive pagination at the bottom of the page.

suffered by Plaintiffs connected to BANA's unlawful foreclosures and related evictions . . . ." *Id.* at 4 ¶ 21.

The Government moves to dismiss, asserting that "the Bennetts have no right of action under the consent order . . . and [they] fail to allege violation of any money-mandating statute." ECF No. 13 at 4.

## II.     Jurisdiction and Legal Standard

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers upon this Court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Accordingly, the Tucker Act provides this Court with jurisdiction to decide "actions pursuant to contracts with the United States, actions to recover illegal exactions of money by the United States, and actions brought pursuant to money-mandating statutes, regulations, executive orders, or constitutional provisions." *Roth v. United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004). It is the plaintiffs' burden to "identify a separate source of substantive law that creates the right to money damages." *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 875 (Fed. Cir. 2007) (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).

Whether this Court has jurisdiction to decide the merits of a case is a threshold matter. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). When deciding a Rule 12(b)(1) motion, the Court "must accept as true all undisputed facts asserted in the . . . complaint and draw all reasonable inferences in favor of the [non-movant]." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). While a *pro se* plaintiff's complaint is generally held to "less stringent standards[,]" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). Even a *pro se* plaintiff must strictly meet its jurisdictional burden. *Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987) ("We agree that leniency with respect to mere formalities should be extended to a *pro se* party, . . . [h]owever, . . . a court may not similarly take a liberal view of that jurisdictional requirement and set a different rule for *pro se* litigants only."). "*Pro se* or not, the plaintiff still has the burden of establishing by a preponderance of the evidence that this Court has jurisdiction over its claims." *Rothing v. United States*, 132 Fed. Cl. 387, 390 (2017) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). To be sure, "[a] motion to dismiss under RCFC 12(b)(1) will be granted if the plaintiff fails to assert appropriate subject-matter jurisdiction, as 'subject matter jurisdiction is strictly construed.'" *Telemaque v. United States*, 82 Fed. Cl. 624, 626 (2008) (citation omitted).

## III.     Discussion

"Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004). In this Court, the United States has waived sovereign immunity for claims covered by the Tucker Act, 28 U.S.C. § 1491. Indeed, as Plaintiffs explain, "[c]ase law [in the Court of Federal Claims] has long distinguished and established three types of claims against the federal government: (1) contractual claims, (2) illegal exaction claims, and (3) money-mandating-statute claims." ECF No. 11 at 8. Because their "Complaint is founded on all three of the various claims listed above[,]" Plaintiffs assert that jurisdiction in the Court of Federal Claims is proper. ECF No. 14 at 8-14. And because the Government addresses Counts I and II together as money-mandating claims and Counts III-V together as claims that rely on the meaning of the Consent Order, the Court does so as well.

### A. 12 U.S.C. § 1818 is not a money-mandating source of law.

Plaintiffs assert that "[t]his Court is the proper venue and jurisdiction for Plaintiff's [sic] claims that the United States, through the Comptroller of the Currency, continuously violated and breached its duties under [12 U.S.C. §] 1818(b)(6)(A)(i) and (ii) . . . to provide Plaintiffs full remediation of harms caused by BANA's unlawful foreclosures." *Id.* at 9 ¶ 4; *see also id.* at 13 ¶ 5 ("Title 12, United States Codes, Section 1818(b)(6)(A)(i) and (ii) places a duty on the Comptroller to ensure restitution for harms listed in Article I of the Consent Order."). Specifically, Plaintiffs claim that 12 U.S.C. § 1818(b)(6)(A)(i) and (ii) required OCC to ensure payment of restitution to "Party Victim Beneficiaries listed in its Consent Order." *Id.* at 11 ¶ 2. And, when "[t]he Comptroller ended the Order and its derivatives on April 1, 2019 without providing the restitution required[,]" the United States became liable for its "failure to abide by Section 1818(b) to remediate BANA's harm." *Id.* ¶¶ 3-4. In other words, because "[t]he Amendment eliminated the Consent Order's Article VII, paragraphs 5(a) and 5(b)[,] which mandated BANA's full remediation" and instead "exchanged it with an agreement to divert remediation funds to the US and State Governments[,]" Plaintiffs contend OCC violated 12 U.S.C. § 1818(b)(6)(A)(i)-(ii) and owes them restitution. *Id.* at 13 ¶ 10.

The Tucker Act provides this Court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). But the Tucker Act does not provide a cause of action. And "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." *United States v. Mitchell*, 463 U.S. 206, 216 (1983). In fact, "money-mandating provisions are uncommon . . . ." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1329 (2020) (citing M. Solomson, Court of Federal Claims: Jurisdiction, Practice, and Procedure 4-18 (2016)). To constitute a money-mandating source of law, "the specific authority granting money relief must be distinct from [the] Tucker Act itself." *Cottrell v. United States*, 42 Fed. Cl. 144, 152 (1998). Therefore, to invoke this Court's jurisdiction, a Plaintiff "must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government . . .'" *Mitchell*, 463 U.S. at 216-17 (quoting *Testan*, 424 U.S. at 400 (citation omitted)). If the Court determines "that the source as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal—the

absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005).

Contrary to Plaintiffs' assertions, 12 U.S.C. § 1818 does not mandate payment of money by the Government. As the Government explains, Section 1818 "concerns the relief that the 'appropriate Federal banking agency' may seek 'for the enforcement of any effective and outstanding notice or order issued under this section.'" ECF No. 13 at 6 (citing 12 U.S.C. § 1818(i)). To this end, it provides OCC—the appropriate Federal banking agency here—with discretion to order a depository institution (*i.e.*, BANA) to stop engaging in unsafe and unsound business practices or violation of law, rules, regulations, and conditions imposed by OCC. 12 U.S.C. § 1818(b)(1). "Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice." 12 U.S.C. § 1818(b)(1). Indeed, 12 U.S.C. § 1818(b)(6) does confer authority to mandate payment of money—but that authority is vested in the Government to order such payment *by depository institutions*. Specifically, the statute provides the OCC "the authority to require such depository institution or such party to--(A) make restitution or provide reimbursement, indemnification, or guarantee against loss" if certain conditions are met. 12 U.S.C. § 1818(b)(6)(A). The remainder of Section 1818(b)(6) grants the OCC authority to require financial institutions to take additional remedial actions. But there is simply nothing in the statutory text that mandates or even implies payment by the *United States* for any violation of Section 1818. It is well settled that claims brought under a money-mandating statute must rely on a "particular provision of law [that] grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967). Here, Section 1818 does not provide Plaintiffs with any right to receive monetary damages from the Government, and therefore this Court does not have jurisdiction over such claims.

Nor does it support Plaintiffs' fiduciary duty claims because Section 1818(b) provides that the appropriate banking agency's authority to issue cease-and-desist orders, which is discretionary, *see* 12 U.S.C. § 1818(b) (providing that the appropriate banking agency "may" issue a cease-and-desist order), also includes several other options the agency may impose to enforce such an order. Specifically, Section 1818(b)(6) lists multiple grants of authority that the appropriate government agency may utilize to correct or remedy violations. These include ordering restitution, but such an order is within the discretion of the appropriate banking agency. *Id*. The fact that these provisions are discretionary indicates they are not imposing a fiduciary duty. *E.g.*, *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1297 (Fed. Cir. 2022).

Therefore, the Courts dismisses Counts I and II.

### B.     Plaintiffs lack authority to enforce the Consent Order.

Plaintiffs next allege that "[t]he Consent Order's Article VII, paragraph (5)(a) and (5)(b) also placed a duty of restitution similar to that of Section 1818(b)(6)(A)(i) and (ii)" on the Government. ECF No. 11 at 13 ¶ 6. Therefore, they argue that "[t]his Court is the proper venue and jurisdiction" to allege "that the United States, through the Comptroller of the Currency, continuously violated and breached its duties under . . . the Consent Order to provide Plaintiffs full remediation of harms caused by BANA's unlawful foreclosures." *Id.* at 9 ¶ 4; *see also* ECF

8

No. 14 at 11-12 (arguing that Section 1818 is money-mandating). According to Plaintiffs, "[t]he Comptroller also established jurisdiction for the Plaintiffs to bring this claim" because the Consent Order provides that "'[n]othing in the Stipulation and Consent or this Order, *express* or implied, shall give to any person or entity, other than the *parties* hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.'" ECF No. 11 at 6-7 ¶ 6 (citing ECF No. 11 at 28) (emphasis in original); see also ECF No. 14 at 10-11.

"[C]laims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's [sovereign immunity] waiver." *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). And the Federal Circuit has held that, in "a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). Indeed, "[t]he jurisdictional analysis for a contract claim . . . is different from a claim alleging a violation of a statute or regulation . . . ." *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 444 (2019); *see Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) ("Contract law is a separate source of law compensable under the Tucker Act.").

But not every allegation of a contract with the United States confers jurisdiction on this Court. As the Federal Circuit recently explained, there is an exception when a claim is "frivolous, wholly insubstantial, or made solely for the purpose of obtaining jurisdiction." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021) (citations omitted). To overcome the motion to dismiss, the Bennetts must allege "a non-frivolous allegation of breach of contract with the government." *Id*. (citation omitted). They do not.

> 1. <u>Neither the Consent Order nor related orders are contracts over which this Court has jurisdiction.</u>

The first question, of course, is whether the Consent Order or Stipulation are contracts at all. The Government argues that they are not contracts at all, much less contracts between the Bennetts and the United States. ECF No. 22 at 2-3. For there to be a valid contract, Plaintiffs must establish "four basic elements: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005) (citation omitted). Here, the Bennetts fail on the first element. The Consent Order states, unambiguously:

> This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and *expressly does not form, and may not be construed to form, a contract binding the Comptroller of the United States*. Nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

ECF No. 11 at 67-68 (emphasis added). Identical language appears in the amendment to the Consent Order as well. *Id.* at 89. Similarly, the Stipulation to the entry of the Consent Order states:

> Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

*Id.* at 70. In other words, the Consent Order and the related documents reflect a mutuality of intent *not* to contract, rendering any claim that a valid contract exists frivolous.

The Stipulation also provides that "[t]he Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities." *Id.* at 71. This acknowledged lack of actual authority further establishes that there is no contract under the fourth *Hometown Financial* criterion, as well. *See* 409 F.3d at 1364 (explaining that a valid contract requires "a government representative having actual authority to bind the United States").

The Bennetts' reliance on *VanDesande v. United States*, 673 F.3d 1342 (Fed. Cir. 2012), to argue that the Consent Order is a contract is unavailing. In *VanDesande*, the Federal Circuit "h[e]ld that consent decrees and settlement agreements are not necessarily mutually exclusive." *Id*. at 1350. That much is not in dispute. But the question here is whether the Consent Order *in this case* is a contract over which there is Tucker Act jurisdiction. To answer that question, the Court considers whether the Consent Order "has all the indicia of a contract." *Id*. at 1351. As explained above, the Consent Order lacks at least two of the required elements of a contract—the mutual intent to contract and a government official with authority to bind the United States, rendering Plaintiffs' contract claims frivolous. The Court, therefore, lacks jurisdiction over the Bennetts' alleged contract claims under *Columbus Regional*.

2. The Bennetts are not parties to the Consent Orders.

Even if the Consent Order or Stipulation were contracts, the question would remain whether the Bennetts could enforce them. As a general matter, "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990). This is because the "government consents to be sued only by those with whom it has privity of contract." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) (citation omitted); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005). "In other words, if a party is not a *signatory* to a contract with the government, it may not bring a direct suit for breach of contract against the government." *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (emphasis added). It

10

is beyond dispute that neither James nor Pamela Bennett are signatories to any contract with the United States.

According to the Amended Complaint, the Bennetts allege that contract based on the April 13, 2011 consent order. *E.g.*, ECF No. 11 at i (alleging "failures related to its breach of obligations listed in its Consent Order of April 13, 2011 and the successive derivative orders related thereto."). The only signatory to that order, however, is the OCC's Deputy Controller for Large Bank Supervision. *Id.* at 68. Related to the Consent Order is the Stipulation, which was signed by the same OCC official and "the duly elected and acting Board of Directors" of BANA. *Id.* at 73-74. The same is true of the amendment to the Consent Order, which is signed only by another Deputy Controller for Large Bank Supervision. *Id.* at 90. Similarly, the stipulation to the amendment was signed only by the Deputy Controller for Large Bank Supervision and "the duly elected and acting Board of Directors" of BANA. *Id.* at 96. There are no other signatories to any of these documents.

The Bennetts make a variety of arguments based on the California Evidence Code that the Government may not dispute that they are parties to the Consent Order. *See* ECF No. 14 at 12-14. These arguments are unavailing. First, Plaintiffs contend that these California Evidence Code provisions apply under Fed. R. Evid. 302 and prohibit the Government from arguing they are not parties to the Consent Order. *Id.* at 13. But Plaintiffs misunderstand Rule 302, which provides: "In a civil case, state law governs the effect of a presumption regarding a claim or defense for which *state law supplies the rule of decision*." Fed. R. Evid. 302 (emphasis added). Here, California law does not provide the rule of decision, so these state evidence codes do not apply. Second, even if the California Evidence Code somehow applied, the Bennetts assert that the OCC admitted they were parties to the Consent Order based on the text of the Consent Order. *See* ECF No. 14 at 13. But these arguments simply state that Plaintiffs' interpretation of the Consent Order is correct, and that the Government is not allowed to dispute their interpretation. This is not the law. The interpretation of the Consent Order is, like the interpretation of a contract, a question of law. *DeLorme Publ'g Co. v. Int'l Trade Comm'n*, 805 F.3d 1328, 1333 (Fed. Cir. 2015) ("Interpretation of [a] Consent Order is a question of law."). As a result, the Plaintiffs may not use evidentiary presumptions to preclude the Government from arguing the meaning of a contract or consent decree.

Finally, the Consent Order and its Amendment clearly provide that "[n]othing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order." ECF No. 11 at 67; *see also id.* at 89. This is typical language for disclaiming third-party beneficiary claims. *See*, *e.g.*, *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 419 (2011) (addressing similar language), *rev'd on other grounds*, 889 F.3d 1331 (Fed. Cir. 2018). The Bennetts, however, read this statement as a confirmation that they are parties to the Consent Order because they claim a benefit under it. This reading is untenable. The only parties to the Consent Order are the Government and BANA. This language makes clear that there are non-parties that may incidentally benefit from the Consent Order, but who may not claim any benefit under the Order. If anyone that could claim to have been wronged by BANA is a party to the Consent Order, then the disclaimer language would be meaningless. Because the Bennetts are not parties to the

11

Consent Order, its Amendment, or any stipulation, they have no "benefit or any legal or equitable right, remedy or claim" under them. ECF No. 11 at 67.

Therefore, there is no non-frivolous argument that the Bennetts are in privity with the United States, and thus the Court lacks jurisdiction over any direct claim under the Consent Order.

### C. The Bennetts are not intended beneficiaries of the Consent Order or Stipulation.

Even though the Court has concluded that the Consent Order and related documents are not contracts, and that even if they were contracts the Bennetts are not in privity with the United States, the Court must determine whether the Bennetts are intended beneficiaries of the Consent Order. If the Bennetts establish that they are intended beneficiaries to the Consent Order as either third-party beneficiaries of a contract or as intended beneficiaries of the Consent Order, they could maintain their actions against the United States. Because the analysis is effectively the same for a contract theory and a consent decree theory, the Court analyzes them together. *E.g.*, *Rehbein v. CitiMortgage, Inc.*, 937 F. Supp. 2d 753, 761 (E.D. Va. 2013) ("Consent judgments and decrees are 'to be construed for enforcement purposes basically as a contract.'") (quoting *United States v. ITT Cont. Baking Co.*, 420 U.S. 223, 238 (1975)).

"[T]he common thread that unites these exceptions [to the privity requirement] is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Accordingly, this Court has jurisdiction to hear claims regarding breach of contract if Plaintiffs are intended third-party beneficiaries of the contract with the Government. *See Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1056 (Fed. Cir. 2012) ("A plaintiff lacking privity of contract can nonetheless sue for damages under that contract if it qualifies as an intended third-party beneficiary."); *Chancellor Manor v. United States*, 331 F.3d 891, 901 (Fed. Cir. 2003) ("Appellants could establish privity of contract if they are intended third-party beneficiaries of a contract with the United States . . . ."). To be sure, parties are not able to enforce a contract as a third-party beneficiary "merely because the contract would benefit them." *FDIC v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003).

Courts have long found that third-party beneficiary status is an "exceptional privilege" and should not be granted liberally. *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912). The fact that the Consent Orders and Stipulations are with the Government is also important "'[b]ecause the government usually acts in the general public interest, third parties [to consent decrees involving the government] are presumed to be incidental beneficiaries,' not intended beneficiaries." *Rehbein v. CitiMortgage, Inc.*, 937 F. Supp. 2d 753, 761 (E.D. Va. 2013) (alteration in original) (quoting *SEC v. Prudential Sec.*, 136 F.3d 153, 158 (D.C. Cir. 1998)) (second alteration in original).

The Government contends that "[t]o overcome this presumption and qualify as an intended beneficiary, the third party must demonstrate that the contracting parties 'intended the third party to be able to sue to protect [the] benefit' the consent judgment conferred on the third party; it is not sufficient to show simply that the parties had *some* intent to benefit the third

12

party." ECF No. 13 at 9 (quoting *Rehbein*, 937 F. Supp. 2d at 761). While this is true, the Federal Circuit has also held that a contract need not afford a third party the "direct right to compensation or the power to enforce that right against the promisor." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *opinion amended on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001) (citation omitted). Instead, plaintiffs asserting third party beneficiary status must "at least, show that [the contract] was intended for [their] direct benefit." *German Alliance Ins. Co.*, 226 U.S. at 230; *Glass*, 258 F.3d at 1354 ("In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."). Without such a showing, "third parties are presumed to be incidental beneficiaries," rather than intended beneficiaries. *Prudential Sec.*, 136 F.3d at 158; *see also* Restatement (Second) of Contracts § 313 cmt. a (1981) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.").

The Consent Order and Amendment clearly provide that "[n]othing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order." ECF No. 11 at 68; *see also id.* at 89. As explained above, that is an explicit statement that the Government did not intend to create any private right to enforce the Consent Order. Nor does the fact that Plaintiffs received a notice indicating eligibility for payment "regarding deficiencies in the mortgage servicing and foreclosure processes of Bank of America" following BANA's Independent Foreclosure Review render them third-party beneficiaries. *See* ECF No. 1-2 at 59-60. The Notice does not amend the Consent Order or otherwise negate the provision in the Order precluding beneficiaries, such as independent borrowers, from becoming parties with a right to enforce its terms. In fact, the Notice the Bennetts received clearly stated that the parties to the Consent Order were the Government and BANA. *Id.*; *see also* ECF No. 11 at 100. Accordingly, not only does the Consent Order not create a third-party right for Plaintiffs to allege breach, but it expressly prohibits it. Because OCC and BANA, as the parties to the Consent Order, did not intend to allow individual borrowers to enforce the Consent Order, Plaintiffs are incidental beneficiaries, not intended beneficiaries. Thus, they are not third-party beneficiaries of a contract (if one existed), and the Court lacks jurisdiction over their claims based on the Consent Order.

Similarly, the Bennetts lack standing to enforce the Consent Order under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), in which the Supreme Court recognized "a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Id*. at 750. Several circuits have interpreted *Blue Chip Stamps* to foreclose standing to incidental beneficiaries but allow intended beneficiaries to bring claims to enforce consent decrees. *E.g.*, *United States v. FMC Corp.*, 531 F.3d 813, 819-21 (9th Cir. 2008).

Because the issue of whether Plaintiffs have standing to enforce a consent decree is not within its exclusive jurisdiction, the Federal Circuit applies the law of the appropriate regional circuit. *E.g.*, *Nitro Leisure Prod., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1359 (Fed. Cir. 2003) ("[W]e defer to the law of the regional circuit when addressing substantive legal issues over which we do not have exclusive subject matter jurisdiction."); *Novamedix, Ltd. v. NDM*

*Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999) (citation omitted) ("Generally, interpretation of a settlement agreement is not an issue unique to patent law, even if arising in the context of a patent infringement suit. In issues that are not unique to patent law, we apply the law of the appropriate regional circuit."). Here, the appropriate regional circuit is the Fourth Circuit because Section 1818(i) provides that any action for the enforcement of an order under Section 1818 may be brought in the district court "within the jurisdiction of which the home office of the depository institution is located . . . ." 12 U.S.C. § 1818(i).[4] Plaintiffs do not dispute that BANA's home office is in Charlotte, North Carolina, nor could they. *E.g.*, *Bory Ryan Inv. LLC v. Bank of Am., N.A.*, No. 3:21-CV-00526-RJC-DSC, 2022 WL 3337738, at *1 (W.D.N.C. Apr. 13, 2022) ("Bank of America, N.A. … is a national banking association with its main office in Charlotte, North Carolina."). Therefore, the Court applies Fourth Circuit law when deciding whether the Bennetts may enforce the Consent Order.

Although the Fourth Circuit has not had occasion to determine whether *Blue Chip Stamps* allows intended or incidental beneficiaries to enforce consent decrees, several district courts within the circuit have adhered to the distinction between intended and incidental beneficiaries. *E.g.*, *Rehbein*, 937 F. Supp. 2d at 761. But this Court need not guess how the Fourth Circuit would resolve the Bennetts' argument that they are entitled to enforce the Consent Order. Among the Plaintiffs' prior litigation regarding the disputed foreclosure is their litigation against BANA in the Western District of North Carolina. That Court squarely held that the April 2011 "Comptroller Consent Order did not create a private right of action." *Bennett I*, 2021 WL 4355959, at *2 (citing *Jurewitz v. Bank of Am., N.A.*, 938 F. Supp. 2d 994, 998 (S.D. Cal. 2013)). This Court agrees.[5] So did the Fourth Circuit. *Bennett II*, 2022 WL 986988, at *1.

For the reasons set forth above, the Bennetts are not intended beneficiaries; rather, they are (at most) incidental beneficiaries that lack standing to enforce the Consent Order. Therefore, the Court lacks jurisdiction over these claims. *Blue Chip Stamps*, 421 U.S. at 755.

### D. Plaintiffs' attempt to reframe their statutory arguments as an illegal exaction fails.

The Tucker Act provides a third waiver of sovereign immunity for claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." *Eastport S.S. Corp.*, 372 F.2d at 1007-08 (describing illegal exaction claims as those in which "the Government has the citizen's money in its pocket") (quoting *Clapp v. United States*, 117 F.Supp. 576, 580 (Ct. Cl. 1954)). In this claim, Plaintiffs again raise the same

---

[4] It is worth noting that Section 1818(i) allows "[t]he appropriate Federal banking agency" to bring an action to enforce an order under Section 1818. This limitation indicates that Congress did not intend for private individuals to bring actions to enforce Section 1818 orders in federal court.

[5] In its Reply, the Government argues that *res judicata* prevents the Bennetts from relitigating this issue in this Court. While that may be so, the Government did not make the *res judicata* arguments in its motion to dismiss, and the Court does not address them. The Court simply finds the district court decision persuasive and follows it based on the decision's merit, not as a matter of *res judicata*.

arguments they raised under 12 U.S.C. § 1818(b)(6)(A)(i)-(ii) and the Consent Order—that the Government owes them restitution. Here, however, Plaintiffs allege that the Amendment to the Consent Order constituted an illegal exaction because it deprived them of the compensation owed under Section 1818. ECF No. 14 at 4 (citing ECF No. 11 at 32-36 ¶¶ 1-15.

An illegal exaction occurs when "money [is] improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (citation omitted). "To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Id.* at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).

The Bennetts' illegal exaction claim rests exclusively on the alleged violation of 12 U.S.C. § 1818(b)(6)(A)(i)-(ii). ECF No. 11 at 36 -39. Thus, assuming the Government exacted money from the Bennetts, their claim necessarily fails because Section 1818 does not explicitly or by necessary implication require the United States to pay the Bennetts in the event of a violation. As explained above, Section 1818 only provides authority for the United States to order private banking institutions to pay restitution to borrowers; there is nothing implying an obligation of the United States to pay anything. Therefore, the Plaintiffs fail to allege facts sufficient to establish the Court's illegal exaction jurisdiction.

### IV. Conclusion

For the foregoing reasons, the Court GRANTS the Government's Motion to Dismiss, ECF No. 13. The Court also DENIES-AS-MOOT the Plaintiffs' motion for summary judgment, ECF No. 29. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge